[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10589
_____

D.C. Docket No. 1:12-cr-20696-MGC-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

FRANTZ PIERRE,
TERRY PIERRE,
CHRISTMANIE BISSAINTHE,

Defendants–Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 14, 2016)

Before MARCUS, DUBINA and MELLOY,[*] Circuit Judges.

DUBINA, Circuit Judge:

Appellants, Frantz Pierre ("Frantz"), Terry Pierre ("Terry"), and Christmanie Bissainthe ("Chris"), appeal their judgments of conviction and sentences for various charges that arose out of a scheme in which the appellants established a sham tax preparation business entitled "TaxProfessors" to file fraudulent income tax returns. The majority of the fraudulent tax returns contained the names of Florida prison inmates and caused the Internal Revenue Service ("IRS") to issue approximately $1.9 million in tax refunds. These tax refunds were paid to TaxProfessors' debit cards that the appellants used at automatic teller machines ("ATMs") to obtain cash and to purchase various items. Following convictions and sentences, the appellants timely appealed. After reading the parties' briefs, reviewing the record, and having the benefit of oral argument, we affirm the appellants' convictions and sentences.

---

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

## I. BACKGROUND

A. *Facts*

The government presented the following evidence at trial. Detective Craig Catlin, a North Miami Beach Police Department officer in the Street Crimes Gang Unit, testified that on June 1, 2010, while driving an unmarked police vehicle, he approached a white Cadillac with dark-tinted windows. He was unable to see inside the car and, based on his experience, he was certain that the window tinting was well below the standards permitted by Florida law. He also noticed that the car had a temporary paper tag that he discovered was registered to Frantz Pierre. Detective Catlin knew that the Pierre family owned a body shop that authorities suspected fraudulently issued temporary vehicle tags. Based on probable cause that the driver was violating Florida law by driving a vehicle with illegally tinted windows, Detective Catlin requested a police officer in a marked vehicle to execute a traffic stop because Detective Catlin did not want his unmarked vehicle identified.

Detective George Festa testified that he responded to the call from Detective Catlin to effectuate the traffic stop. When the driver of the Cadillac stopped the car, Detective Festa asked all the occupants to exit the vehicle. Terry exited from the front passenger side door, his wife exited from the driver's side, and another

3

female exited from the backseat with her child. Detective Festa, in the course of his normal traffic stop procedures, asked if he could search the car and whether there were drugs or guns in the vehicle. Terry responded that Detective Festa could search the car. Upon conducting the search, Detective Festa saw cards wrapped in paper in the center console by the cup holder. Detective Festa noticed that each piece of paper that was wrapped around the cards had a dollar value on it. When asked about the cards, Terry responded that they belonged to a friend, and Detective Festa could take them. Detective Festa observed that each card was a debit card with the name "TaxProfessors" imprinted on the cards. Detective Festa did not issue any citation to the driver because she was not the owner of the vehicle.

After receiving the debit cards, that were later identified as prepaid debit cards issued by PayCard USA to TaxProfessors, Detective Catlin began a criminal investigation. He obtained the listed business address for TaxProfessors and noticed that it was incorporated in 2010 by Venus Highsmith, an acquaintance of Frantz's wife. However, Detective Catlin later discovered that someone used Venus Highsmith's name to incorporate TaxProfessors—she herself did not incorporate the sham business. The official corporate address for the business was in reality an address for a bakery establishment. Chris signed a lease for

4

TaxProfessors in Miramar Executive Center but did not conduct any business there.  Frantz leased a second location in Miramar Executive Center for AlterEgo Clothing, another sham business.  Chris was listed as the emergency contact person on the lease documentation for AlterEgo Clothing.  The prepaid debit cards at issue were mailed to the AlterEgo Clothing address.

After the traffic stop and a preliminary investigation, officers obtained a search warrant for Frantz's home in Parkland, Florida.  Frantz was not present at the time of the search, but his wife, Terry, and several other adults and children were present.  During the execution of the search warrant, an officer observed someone toss a large item from a second floor window.  The large item was a laptop computer.  Officers searched Terry's bedroom and found papers with social security numbers ("SSNs"), names, and notations regarding bank routing numbers, tax information, and debit card balances.  They also discovered two thumb drives and a Turbo Tax program, the same program used to file the TaxProfessors returns.

Douglas Meli worked at PayCard USA during the applicable time period and explained to the jury the prepaid debit card program.  He stated that the PayCard is a reloadable prepaid debit card with a unique account number, but that all the cards have a routing number for Palm Desert National Bank in California.  The cards are not embossed with an individual's name but when they issue cards in bulk, they

5

put the purchasing company's name on the front of the cards.  In this case, the name "TaxProfessors" was imprinted on the cards.  To register and activate the cards, he testified that the purchasing company supplies identity information ("identifiers"), including a name, date of birth ("DOB"), SSN, and address.  PayCard then validates the identity information and only three of the four identifiers have to match for the verification system to activate the card and allow money to be loaded onto the card.  The cards can be loaded with funds either by direct deposit or by tax refunds.  Once the cards are funded, they can be used by anyone who possesses them to withdraw money at an ATM and to make purchases.

Marichelle Henry ("Henry") testified that she was employed with the Florida Department of Children and Families as a child protective investigator and had access to personal identifying information through a state database.  Chris asked Henry if she would provide SSNs from the database to her for a price, and Henry refused.  However, after a second request, Henry capitulated.  Chris provided a printout from the Florida Department of Corrections website that contained a list of inmates, and, after accessing the database twice, Henry found the SSNs for approximately 25 people whose names were on the list.  Chris paid Henry $8,000

6

for the SSNs and gave her a prepaid debit card with a personal identification number ("PIN") so she could withdraw money from the card.

The government also presented testimony from five former inmates who stated that they did not know the appellants, did not authorize TaxProfessors to submit tax returns for them, and did not sign tax returns for 2009 because they were incarcerated. These witnesses identified 2009 tax returns that contained their personal identifying information on them. The government introduced surveillance photographs, video recordings, and documents from Bank of America, Wells Fargo Bank, and Publix supermarkets of ATM withdrawals and/or money order purchases as well as point of sale transactions made using the TaxProfessors debit cards. It further introduced spreadsheets that contained cardholder information, balances, and transactions history for the TaxProfessors debit cards in question. A total of $1,297,079.59 was loaded onto these debit cards. The ATM withdrawals totaled approximately $328,000, and the point of sale transactions totaled approximately $235,000.

Agent Ken Fry ("Agent Fry"), a criminal investigator with the IRS, testified that he investigated a tax and identification theft in Minnesota involving a company called Tax Association of America ("TAA"), which Frantz incorporated in July 2010, soon after the TaxProfessors accounts were frozen as a result of the

7

criminal investigation in Florida.  Agent Fry stated that TAA opened an account with Wells Fargo, and tax refunds from the IRS were deposited into the account, totaling approximately $450,000.  Agent Fry discovered that these tax refunds contained the names of current or past inmates in the Florida Department of Corrections.  Agent Fry subpoenaed Comcast internet service records that showed an Internet Protocol ("IP") address[1] assigned to a Florida residence in Terry's name.  When he first ran the IP address through the IRS Scheme Development Center, he did not find any tax returns filed from that address, but one or two months later, he discovered approximately 30 fraudulent tax returns filed from that address.

B.  *Procedural History*

In September 2012, a Southern District of Florida grand jury returned a 13 count indictment against Frantz, Terry, and Chris.  Specifically, Count 1 charged all three with conspiracy to defraud the IRS, in violation of 18 U.S.C. § 286; Count 2 charged all three with conspiracy to traffic in or use unauthorized access devices, in violation of 18 U.S.C. § 1029(b)(2); and Count 3 charged all three with the use of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(2).  The

---

[1] *See United States v. Steiger*, 318 F.3d 1039, 1042 (11th Cir. 2003) (defining IP address as a "unique address assigned to a particular computer connected to the Internet") (quoting Daniel J. Solove, *Digital Dossiers and the Dissipation of Fourth Amendment Privacy*, 75 S. Cal. L.Rev. 1083, 1145 (2002)).

8

indictment also charged Terry with three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 4, 5, 11); Frantz with three counts of aggravated identity theft (Counts 6, 9, 10); and Chris with three counts of aggravated identity theft (Counts 7, 8, 12).  Finally, the indictment charged Frantz with possession of 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3) (Count 13).  A jury returned guilty verdicts on all counts charged, and the district court denied Frantz's and Chris's post-trial motions.  Thereafter, the district court sentenced appellants as follows: 208 months' imprisonment for Frantz; 121 months' imprisonment for Terry; and 84 months' imprisonment for Chris.  Each sentence also included supervised release, monetary assessments, and restitution.

## II. ISSUES

1.  Whether the district court correctly denied Frantz's and Terry's motions to suppress (a) evidence seized during a traffic stop, and (b) evidence seized from the Parkland residence.

2.  Whether the government presented sufficient evidence to support Terry and Chris's convictions for (a) conspiracy to defraud the United States, (b) conspiracy and use of unauthorized access devices to defraud, and (c) aggravated identity theft.

3.  Whether the district court plainly erred in admitting testimony from a SWAT team officer executing a search warrant on the Parkland residence.

4.  Whether the district court imposed reasonable sentences.

## III. STANDARDS OF REVIEW

This court reviews a district court's order denying a motion to suppress evidence under a mixed standard, reviewing the court's findings of fact for clear error and the application of law to those facts de novo, construing the facts in the light most favorable to the prevailing party below. *United States v. Ramirez*, 476 F.3d 1231, 1235–36 (11th Cir. 2007).

This court reviews "the sufficiency of evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

We review for abuse of discretion a district court's ruling on evidentiary matters. *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007).

When reviewing sentencing guideline issues, this court "reviews purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference." *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010)

10

(internal quotation marks omitted).  "For a finding to be clearly erroneous, this Court must be left with a definite and firm conviction that a mistake has been committed."  *Id.* (internal quotation marks omitted).  This court, considering the totality of the facts and circumstances, reviews the final sentence imposed by the district court for reasonableness and reviews the reasonableness of the sentence for an abuse of discretion.  *United States v. Irey*, 612 F.3d 1160, 1188–90 (11th Cir. 2010) (en banc).

## IV. DISCUSSION

A.  *Motions to Suppress*

1. Traffic stop

Frantz and Terry challenge the district court's denial of their motions to suppress the TaxProfessors debit cards that the officer seized after the June 1 traffic stop, claiming that the proffered reason for the traffic stop—illegally tinted windows—was a mere pretext that rendered the ensuing search unlawful.  They contend that the officer's sole purpose in executing the traffic stop was his knowledge that the registered owner of the vehicle, Frantz, was a gang member. They also assert that even if Terry consented to the search of the vehicle, the search exceeded the scope of the consent.

Pursuant to the Fourth Amendment, police may stop a vehicle if they have probable cause to believe that a traffic violation has occurred. *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials . . . are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (quoting *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983) (internal quotation marks omitted)). The probable cause standard is objective, and the officer's subjective motives in executing the traffic stop are irrelevant. *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996). Under Florida law, it is a traffic violation to drive with illegal tints, and it provides a valid basis for a traffic stop. *See* Fla. Stat. § 316.2953.

The district court conducted an evidentiary hearing on the motions to suppress and found probable cause existed for the traffic stop. Detective Catlin testified that when he approached the Cadillac, he could not see inside the car. Based on his experience, he knew that the darkened windows violated the legal tinting limits. The district court credited this testimony, and appellants cannot demonstrate that the finding of credibility is clearly erroneous. Because the facts and circumstances were sufficient to alert the officer that an offense was being

12

committed, we conclude that probable cause existed for the traffic stop. *See Whren*, 517 U.S. at 813–14, 116 S. Ct. at 1774 (stating that the court's only relevant inquiry is whether the officer's conduct was objectively reasonable regardless of subjective intent or motive). Moreover, as the district court found, Terry consented to the search. *See United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) (noting that voluntary consent to a search is a well-established exception to the Fourth Amendment's probable cause and warrant requirements). Terry does not present any evidence to contradict the district court's finding of consent. Accordingly, we conclude from the record that the district court did not err in denying the motions to suppress the TaxProfessors debit cards found in the vehicle.

2. Residence search

Frantz contends that the district court erred by denying his motion to suppress the evidence seized from the search of his Parkland residence. He argues that Agent Fry's warrant affidavit contained materially false information. The alleged materially false information concerned the IP address from which the fraudulent tax returns were filed. To support the affidavit, Agent Fry stated that 30 fraudulent tax returns were filed from the IP address connected to the Parkland home. However, at the suppression hearing, Agent Fry testified that initially the

13

IRS search results did not indicate that 30 fraudulent tax returns were filed from the IP address connected to the Parkland residence, but a subsequent check confirmed that they were filed from that residence. He further stated that a subsequent analysis revealed that all 30 tax returns were fraudulent.

There was no error. First, after discussion at the suppression hearing, Frantz's counsel conceded that the warrant affidavit information was not false. Second, after Agent Fry testified at trial, Frantz did not renew his motion to suppress the evidence seized from his residence on the ground that Agent Fry's testimony revived his argument about the materially false warrant affidavit. Third, comparing the affidavit with Agent Fry's testimony, we conclude that there was no falsity in the affidavit because the subsequent analysis confirmed the warrant affidavit information. Hence, Frantz's argument is unavailing.

B. *Sufficiency of the Evidence*

1. Conspiracy to defraud

Terry and Chris challenge their convictions for conspiracy to defraud, conspiracy to use access devices to defraud, and identity theft. We review their challenges de novo, and we "will not overturn [the] conviction[s] on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *United States v. Wright*, 392

14

F.3d 1269, 1273 (11th Cir. 2004) (internal quotation marks omitted).  Based on our review of the evidence in the light most favorable to the government and "drawing all reasonable inferences and credibility choices in favor of the jury's verdict" as we must, we affirm the convictions.  *Taylor*, 480 F.3d at 1026.

To support a conviction under 18 U.S.C. § 286, conspiracy to defraud the United States by filing false tax returns, the government had to prove "the existence of an agreement to achieve an unlawful objective, the defendant[s'] knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it."  *United States v. Gupta*, 463 F.3d 1182, 1194 (11th Cir. 2006) (internal quotation marks omitted).  "Conspiracy may be proven by circumstantial evidence and the extent of participation in the conspiracy or extent of knowledge of details in the conspiracy does not matter if the proof shows the defendant[s] knew the essential objective of the conspiracy."  *Id.* (internal quotation marks omitted).  The government may present circumstantial evidence to prove knowledge of the scheme.  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).  Terry and Chris specifically challenge the government's evidence regarding the knowledge and willful participation element.

The government's presentation of evidence was sufficient for the jury to find beyond a reasonable doubt that Terry and Chris knew about the tax fraud scheme

15

and willfully participated in the scheme.  Henry testified that Chris paid her to

obtain SSNs for Florida inmates and told her that the SSNs were necessary to file

tax returns.  The evidence showed that Chris signed a lease for office space for a

sham business, and she was the emergency contact person on a lease for another

sham business.  One of these locations, AlterEgo Clothing, was the recipient

address of the blank debit cards from PayCard that were used by all appellants.

As for Terry, the government presented evidence that during the traffic stop,

police found him in the possession of several of the TaxProfessors debit cards

loaded with fraudulently obtained tax refunds.  The government presented video

surveillance that showed Terry using the debit cards to withdraw money at an

ATM.  In addition, the government presented evidence obtained from the search of

Terry's bedroom that included lists with names, DOB, SSNs, as well as PIN

numbers on them.  Most significantly, Terry admitted to his involvement in the

scheme.  Accordingly, we conclude that the evidence was sufficient to support the

jury's guilty verdicts on the conspiracy to defraud counts for Chris and Terry.

2.  Conspiracy and use of unauthorized access devices to defraud

To sustain Terry and Chris's convictions for conspiracy and use of

unauthorized access devices to defraud, the government had to show that they (1)

knowingly used or trafficked in one or more unauthorized access device ("UAD"),

16

(2) with intent to defraud, (3) to obtain anything having an aggregate value of $1,000 or more during a one-year period, and (4) such use affected interstate or foreign commerce. *See* 18 U.S.C. § 1029(a)(2); *United States v. Klopf*, 423 F.3d 1228, 1240 (11th Cir. 2005). "Intent to defraud has often been defined as the specific intent to deceive or cheat, for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self." *Klopf*, 423 F.3d at 1240 (quoting *United States v. Peden*, 556 F.2d 278, 280 (5th Cir. 1977) (internal quotation marks omitted)).

The government presented sufficient evidence that both Terry and Chris engaged in numerous transactions during several months in 2010 using TaxProfessors debit cards, all of which had been loaded with fraudulently obtained tax refunds. Surveillance video showed both Terry and Chris purchasing numerous money orders at various Publix supermarkets and withdrawing money from ATMs. The evidence also showed Chris using the debit cards to purchase more than 40 money orders at six different stores totaling approximately $20,000, making four withdrawals at ATMs totaling $1500, and purchasing over $1000 of furniture. A reasonable jury had sufficient evidence to conclude that Chris knew that TaxProfessors was not a legitimate tax preparation business and that the debit cards were fraudulently obtained. As for Terry, the government showed

17

surveillance video of him using the debit cards to purchase three money orders totaling $4500 and making 16 ATM withdrawals totaling approximately $7000. The government also presented incriminating evidence obtained from the search of Terry's bedroom at Frantz's Parkland residence. Significantly, Terry admitted to his involvement in the fraudulent tax scheme. Accordingly, the government presented sufficient evidence from which a jury could find guilt beyond a reasonable doubt that both Chris and Terry conspired and used UADs to defraud.

3. Aggravated identity theft

The government charged Terry and Chris with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), which requires proof that the appellants "(1) knowingly transferred, possessed, or used; (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to" a predicate act (using UADs), including access device fraud. *United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011). The government had to show that the appellants knew that the means of identification at issue belonged to another person, and it could "rely on circumstantial evidence about an offender's misuse of a victim's identity to prove the offender knew the identity belonged to a real person." *United States v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir. 2010). Moreover, a jury reasonably could conclude that the appellants "knew that

18

the cards were issued in the names of real people, because the federal government is unlikely to issue tax returns unless it has verified that the person requesting it is a real person." *United States v. Baldwin*, 774 F.3d 711, 726–27 (11th Cir. 2014).

At trial, the government introduced evidence documenting the individual transactions referenced in the substantive counts for Terry and Chris. It introduced evidence that Chris purchased SSNs for Florida prison inmates from Henry and that she leased office space for a sham tax preparation business. It also presented evidence from five former Florida inmates who testified that they did not file tax returns for the year in question, 2009, and did not authorize TaxProfessors to file tax returns for them. These witnesses identified tax returns prepared by TaxProfessors that contained their identifying information. The jury reasonably inferred from this evidence that Chris knew she lacked lawful authority to use debit cards loaded with fraudulently obtained tax refunds in the names of actual Florida inmates. In addition to the documented evidence of Terry's individual transactions and the incriminating evidence seized from the search of his bedroom, the government showed that Terry admitted that he had purchased identities on the street and used these identities to file fraudulent tax returns. This evidence supports the jury's finding of guilt beyond a reasonable doubt on the aggravated identity theft charges for both Terry and Chris.

19

C. *Evidentiary Admission*

Frantz asserts for the first time on appeal that the district court plainly erred by permitting the government to present testimony of SWAT team member Richard Saito ("Saito") that inferred that Frantz was a violent person.[2]  During his testimony, Saito described the operation employed for the execution of the warrant on Frantz's Parkland residence.  He explained the SWAT team members' different locations on the perimeter of the residence, the equipment they possessed, and the removal of the residents.  Frantz contends that this testimony was irrelevant and lured the jury into believing that he was a dangerous criminal because 12 SWAT team members armed with high-powered weapons were needed to ensure the execution of the warrant.

Frantz cannot show that there was any error, much less, plain error.  The evidence was relevant to the events surrounding the search, and on cross examination, Saito testified that no force was necessary during the execution of the warrant and that Frantz was not even present at the time.  Hence, Frantz's argument is unavailing.

---

[2] We review unpreserved evidentiary rulings for plain error.  *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003).

20

D. *Sentences*

1. <u>Vulnerable victim enhancement</u>

Appellants challenge the district court's application of the vulnerable victim enhancement to their sentences. We give due deference to a district court's factual determination that a victim was vulnerable. *United States v. Kapordelis*, 569 F.3d 1291, 1315–16 (11th Cir. 2009). The government must establish facts supporting a sentencing enhancement by a preponderance of the evidence. *United States v. Turner*, 626 F.3d 566, 572 (11th Cir. 2010).

The sentencing guidelines provide for a two-level sentencing enhancement if the defendant knew or should have known that a victim of the offense was a "vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction . . .; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.*, comment. (n.2). The applicability of this enhancement is appropriate where the defendant knows the victim has unique characteristics that make him more vulnerable to the specific crime than other potential victims of the crime. *See United States v. Bradley*, 644 F.3d 1213, 1288 (11th Cir. 2011) (noting that the enhancement is "meant to apply whenever a defendant selected his victim to take advantage of that victim's

21

perceived susceptibility to the offense"); *see also United States v. Moran*, 778 F.3d 942, 978–79 (11th Cir. 2015) (finding that enhancement applies when the defendant specifically targets his victims based on their perceived vulnerability to the offense). In construing the "otherwise particularly susceptible" language in § 3A1.1, we have acknowledged that "circumstances and immutable characteristics" can render a victim of criminal activity unusually vulnerable. *Bradley*, 644 F.3d at 1288.

In this particular tax refund fraud scheme, inmates have unique circumstances and immutable characteristics that make them more vulnerable to this type of fraudulent activity. Inmates usually do not file tax returns during periods of incarceration, and they are less likely to discover that their identities have been compromised. This fraudulent tax refund scheme succeeded because the appellants knew that the incarcerated inmates would be less likely to discover the identity theft, especially when the appellants filed the 2009 fraudulent tax refunds post-April 15. As the district court found, and the evidence supports, the appellants specifically targeted inmates based on their perceived vulnerability to the tax refund fraud offense.

We conclude that the government presented sufficient evidence that the appellants specifically targeted inmates to effectuate their fraud schemes. The

evidence showed that Chris recruited and paid Henry for the SSNs that corresponded with the Florida Department of Corrections inmate numbers that were provided in the list Chris gave Henry. Moreover, the evidence showed that the appellants filed over 338 fraudulent tax returns, the majority of them in the names of incarcerated individuals, after the end of the filing season, making it less likely for the inmates to discover that their identities had been compromised. In addition, the government presented evidence that showed the appellants withdrawing money from the debit cards and securing money orders with the debit cards all within a few months after the IRS loaded the refunds on the debit cards. Accordingly, we conclude from the record that the district court properly applied the two-level sentencing enhancement pursuant to U.S.S.G. § 3A1.1(b)(1).

2. Mitigating role reduction

Chris challenges the district court's failure to apply a minor role reduction to her sentence because she had no decision-making authority in the scheme, did not recruit anyone to participate in the scheme, and did not prepare any fraudulent tax returns. She cannot satisfy her burden of establishing her qualification for a role reduction by a preponderance of the evidence. *See United States v. Alvarez-Coria*, 447 F.3d 1340, 1343 (11th Cir. 2006).

23

Under U.S.S.G. § 3B1.2, a defendant may receive a two-level reduction "[i]f the defendant was a minor participant in any criminal activity," or in other words, the adjustment applies to a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.5). The determination of whether to apply a mitigating role adjustment "is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." *Id.* comment. (n.3(C)).

The evidence at trial showed that Chris played a vital role in the conspiracy by signing and paying for office leasing space for sham businesses. Chris also recruited and paid Henry to secure SSNs for inmates, which was vital to the successful operation of the conspiracy. Chris profited from the conspiracy by purchasing items, withdrawing cash, and obtaining money orders with the fraudulent debit cards. In light of this evidence, she cannot demonstrate that she was entitled to a minor role sentencing reduction.

Likewise, Terry cannot demonstrate by a preponderance of the evidence that he was entitled to a minor role reduction. Although he was not a leader in the conspiracy, the evidence presented at trial showed that he obtained identifying information himself, filed false tax returns, and profited from the scheme by using

24

the fraudulent debit cards.  Additionally, officers found incriminating evidence in his bedroom when they searched Frantz's residence.  Considering this evidence and his admission of participation in the conspiracy, we conclude that the district court did not err in denying Terry a minor role sentencing reduction.

3.  Production enhancement

All appellants objected to the two-level enhancement imposed by the district court pursuant to U.S.S.G. § 2B1.1(b)(11)(B)(i) because their offenses involved the production or trafficking of UADs.  They claimed that this enhancement amounted to double-counting and was impermissible.  A recent opinion by our court forecloses their argument.  *See United States v. Taylor*, 818 F.3d 671 (11th Cir. 2016).

In *Taylor*, we held that the production enhancement to a sentence imposed in conjunction with a § 1028A conviction, when the underlying conduct in issue involves production, is permissible.  We noted a clear distinction between production, which includes manufacture, design, alteration, authentication, duplication or assembly, and "transfer, possession, or use."  *Id.* at 676.  We opined that conduct entailed in production is more problematic than mere transference because by producing UADs, a defendant furthers the criminal scheme and creates more opportunities for the prohibited conduct to continue.  *Id.* at 677.  Thus, we

25

held that district courts may apply the enhancement to a defendant's sentence, even when that defendant also has been convicted of a § 1028A offense, if the government demonstrates, by a preponderance of the evidence, that the defendant's relevant conduct included the production of an UAD. *Id.* at 677–78.

The government presented such evidence here, and the district court made a specific finding that the offense involved production. Accordingly, we conclude that the district court did not err in applying the two-level enhancement.

4. Loss amount calculation

Chris and Terry challenge the district court's loss amount calculation in their sentences. We review a district court's loss determination for clear error. *Baldwin*, 774 F.3d at 727. The district court need not determine the loss amount precisely, but "need only make a reasonable estimate of the loss, given the available information." *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011) (quoting *United States v. Lee*, 427 F.3d 881, 893 (11th Cir. 2005) (internal quotation marks omitted)). The district court may make factual findings regarding loss based on trial evidence, undisputed statements in the presentence report, or evidence presented at the sentencing hearing. *Bradley*, 644 F.3d at 1290.

Both appellants received a 16-level enhancement based on a loss of more than $1 million but less than $2.5 million. *See* U.S.S.G. § 2B1.1(b)(1)(I). This

26

amount was solely related to the TaxProfessors debit cards and not the overall tax refund fraud scheme. Regardless, they contend that the loss should have been limited to the amount that resulted from the actual withdrawals, not the intended loss. However, the guidelines instruct that the loss amount be determined based on "the greater of actual loss or intended loss." *Id*. § 2B1.1, comment. (n.3(A)). Once a district court makes "individualized findings concerning the scope of criminal activity undertaken by a particular participant," it can determine foreseeability. *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003).

Chris and Terry claim that the district court failed to make individualized findings regarding the scope of each one's activity and thus erroneously determined foreseeability. Regardless of whether the district court made individualized findings, the record supports the district court's determinations. *See United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002) (finding that a sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record supports the court's determination).

The evidence established that both Chris and Terry participated in the submission of 338 fraudulent and unauthorized tax returns seeking over $2 million from the IRS. The fact that the authorities halted the scheme before the IRS paid

27

the entire amount is of no moment.  The IRS paid the majority of the requested

fraudulent refund amounts, which was over $2 million.  Because the intended loss

is greater in this case than the actual loss and, according to the guidelines, the

district court can use the greater of either in its loss amount calculation if the

record supports such an amount, the district court did not err.  Moreover, a "district

court may hold participants in a conspiracy responsible for the losses resulting

from the reasonably foreseeable acts of co-conspirators."  *United States v. Mateos*,

623 F.3d 1350, 1370 (11th Cir. 2010) (quoting *United States v. Hunter*, 323 F.3d

1314, 1319 (11th Cir. 2003)).  The record evidence supports the district court's

determination, and we will not vacate the sentences on this basis.

## V.  CONCLUSION

The record contains sufficient evidence to support the jury's verdicts, and

the district court did not err in denying the motions to suppress or in allowing the

SWAT officer to testify regarding the mechanics of the residential search.  Hence,

we affirm appellants' convictions.  Moreover, we conclude that the sentences

imposed by the district court were reasonable.  In this particular fraudulent tax

refund and identity theft scheme, the appellants specifically targeted incarcerated

individuals because of their particular susceptibility, and, therefore, the two-level

vulnerable victim sentencing enhancement was appropriate.  Accordingly, we

28

affirm Frantz's total sentence of 208 months' imprisonment, Terry's total sentence of 121 months' imprisonment, and Chris' total sentence of 84 months' imprisonment.

    **AFFIRMED**.