[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11072
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-00130-TWT-JFK-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KAMALI RIVES,
a.k.a. Kut,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 28, 2017)

Before TJOFLAT, WILLIAM PRYOR, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Defendant Kamali Rives appeals his 234-month sentence, imposed after pleading guilty to multiple charges of bank fraud, access device fraud, and aggravated identity theft.  On appeal, he argues that the district court clearly erred in calculating the loss amount for purposes of determining his advisory guideline range.  After careful review, we affirm.

## I.    <u>BACKGROUND</u>

Defendant's convictions stem from a bank fraud conspiracy, in which Defendant and his co-conspirators stole checks from a Bank of America lockbox facility, deposited those checks into fraudulent bank accounts, and then withdrew money from those accounts.  Defendant also used the information gleaned from those checks to access the bank accounts held by the account holders, alter the contact information, and withdraw money from the accounts for his own personal use.

According to the Presentence Investigation Report ("PSR"), Jimia Fannon worked in a lockbox unit processing checks from envelopes that were mailed to Bank of America's P.O. Box.  Fannin stole checks from the lockbox facility and gave them to Defendant and another individual named Rashon Bohannon.  Defendant and Bohannon directed Ashley Posey and others to open fraudulent checking accounts in names similar or identical to the "payee" identified on the stolen checks.  Defendant and his co-conspirators deposited the stolen checks into

these accounts and withdrew money for their own personal use.  Utilizing the information from the stolen checks, Defendant and Bohannon accessed the bank accounts, changed the customer account contact information, and then withdrew money from those accounts.

In September 2010, officers with the Hapeville Police Department contacted the United States Postal Inspector regarding an investigation pertaining to Defendant and Bohannon.  Hapeville officers had responded to the scene of an alleged armed robbery at a hotel room rented by Defendant and Bohannon.  When officers were not able to make contact, they conducted a "welfare" check and observed multiple credit cards and debit cards on the bed.  After obtaining a search warrant for an additional room rented by Defendant and Bohannon, officers found multiple cards in various names, stolen checks, and other documents containing personal identifying information.  The checks included 13 business checks (totaling $904,561) and 23 personal checks (totaling $11,086).

Approximately three years later, Darryle Pulliam informed law enforcement that Defendant beat him after he refused to participate in a credit card fraud scheme.  Officers later conducted a knock-and-talk at the location provided by Pulliam, which uncovered a counterfeit credit card operation.  Defendant admitted to officers that he manufactured counterfeit credit cards.

3

A federal grand jury subsequently issued an indictment charging Defendant with the following:  (1) conspiracy to commit bank fraud, 18 U.S.C. § 1349 ("Count 1"); (2) bank fraud, 18 U.S.C. §§ 1344 & 2 ("Counts 2 through 11"); (3) access device fraud, 18 U.S.C. §§ 1029(a)(2), (a)(3), (a)(4) & 2 ("Counts 12 through 17 and Count 23"); and (4) aggravated identity theft, 18 U.S.C. §§ 1028A(a)(1) & 2 ("Counts 18 through 22").  Following the denial of his motion to suppress, Defendant pled guilty to all charges.

In anticipation of sentencing, the probation officer prepared the Presentence Investigation Report.  The PSR assigned Defendant a base offense level of 7, pursuant to U.S.S.G. § 2B1.1.  Defendant received a 16-level enhancement under § 2B1.1(b)(1)(I) because the offense involved an intended loss of $2,024,865.29.  The intended loss amount included the following:  (1) $877,153.28 in deposited checks stolen by Fannin; (2) $904,561.14 in recovered corporate checks; (3) $11,086.27 in recovered personal checks; and (4) $232,064.60 of checks reported stolen from the Bank of America lockbox by identity theft victims.

Defendant also received various other enhancements not relevant to this appeal, which resulted in a total offense level of 33.  Based on a total offense level of 33 and a criminal history category of V, Defendant's guideline range was 210 to 262 months' imprisonment.  The PSR noted that Defendant was also subject to a 24-month mandatory minimum sentence to run consecutive to any imprisonment

4

sentence imposed.  Of relevance to this appeal, Defendant objected to the PSR's attribution of the full loss amount to him.

At sentencing, in order to address Defendant's objection to the loss calculation, the Government presented testimony from United States Postal Inspector Nathaniel Sims.  Inspector Sims testified that he prepared four spreadsheets summarizing the loss amounts pertaining to Defendant's bank fraud scheme.[1]  Sims connected Defendant to the deposited checks totaling $877,153.28 based on (1) text messages between Fannin, Defendant, and Bohannon, (2) Fannin's own statements that she stole the checks for Defendant and Bohannon, and (3) surveillance footage showing Defendant depositing two of the checks. When Inspector Sims interviewed James Ray, who deposited one of the stolen corporate checks, Ray told him that he received the check from an individual named "Kut."  Sims later determined that the phone number Ray provided for "Kut" belonged to Defendant.

Next, Sims explained that Defendant was accountable for the corporate and personal checks—totaling $904,561.14 and $11,086.27, respectively—found during the 2010 search of Defendant's hotel rooms.  Sims explained that the final

---

[1]  Though they provided more detailed information, the four spreadsheets presented at the sentencing hearing listed the same checks and identity theft victims as those listed in the PSR. The spreadsheets also separated the loss amounts into the same four categories depicted in the PSR:  (1) deposited checks; (2) recovered corporate checks; (3) recovered personal checks; and (4) identity theft victims who reported stolen lockbox checks.

amount for which Defendant was accountable totaled $232,064.60 and pertained to the various instances of identity theft—including fraudulently obtained loans and fraudulently accessed bank accounts—that occurred as a result of the victims' information having been obtained from the checks processed at the lockbox facility.

Following Sims's testimony, the Government argued that it had shown by a preponderance of the evidence that a reasonable estimate of the intended loss was between $1,500,000 and $3,500,000, and that Defendant should be held accountable for the full amount of loss. Defendant responded that he was responsible only for the checks that he personally withdrew funds from and those of which he induced others to steal. The district court disagreed with Defendant's interpretation of relevant conduct, stating that Defendant and the other participants were involved in "one big check fraud scheme," so each participant's actions could be attributed as relevant conduct to the other participants. Concluding that a reasonable estimate of the intended loss far exceeded $1,500,000, the district court determined that the 16-level loss enhancement was applicable.

Because the district court sustained an objection not relevant to this appeal, it recalculated an amended guideline range of 168 to 210 months' imprisonment, followed by a consecutive sentence of 24 months' imprisonment. Ultimately, the district court sentenced Defendant to a total of 234 months' imprisonment,

consisting of 210 months as to Counts 1 through 11, 180 months as to Count 23, 120 months as to Counts 12 through 17, all to run concurrently to each other, and 24 months as to Counts 18 through 23, to run concurrently to each other but consecutive to Defendant's other sentences. This appeal followed.

## II.    DISCUSSION

Defendant argues that the district court clearly erred in calculating the intended loss amount attributable to him.[2] We review the district court's calculation of the loss amount for clear error. *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011). Although the district court is only required to make a reasonable estimate of the loss, the loss calculation must be supported by reliable and specific evidence. *Id.*; *see also* U.S.S.G. § 2B1.1, comment. (n.3(C)) ("The court need only make a reasonable estimate of the loss."). In calculating the amount of loss attributable to a defendant, the district court may rely on "trial evidence, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Pierre*, 825 F.3d 1183, 1197 (11th Cir. 2016).

Section 2B1.1(b)(1)(I) of the Sentencing Guidelines provides for a 16-level enhancement in the base offense level if the loss exceeds $1,500,000 but is less

---

[2] We note that Defendant does not appear to challenge the actual calculation of the total intended loss amount. He instead takes issue with the district court's determination that he was accountable for the full amount of the loss.

than $3,000,000.  *See* U.S.S.G. § 2B1.1(b)(1)(I), (J).  The commentary states that the loss determination is measured by the greater of the actual loss or intended loss. *Id.* § 2B1.1, comment. (n.3(A)).  Intended loss is defined as "the pecuniary harm that the defendant purposefully sought to inflict," or the "intended pecuniary harm that would have been impossible or unlikely to occur."  *Id.* § 2B1.1, comment. (n.3(A)(ii)).  "A reasonably foreseeable pecuniary harm is one that the defendant 'knew or, under the circumstances, reasonably should have known, was a potential result of the offense.'"  *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014) (quoting U.S.S.G. § 2B1.1, comment. (n.3(A)(iv))).

Here, the district court did not clearly err by determining that Defendant was accountable for the full amount of intended loss totaling $2,024,865.29.  As to the conclusion that the full amount of the deposited checks could be attributed to Defendant, Defendant asserts that he should only be responsible for the checks that he personally deposited or induced to be stolen.[3]  We disagree.  The Guidelines provide that in the case of a joint criminal activity, a defendant is accountable for the conduct of others, if that conduct was (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and

---

[3]  Defendant specifically identifies certain checks that were not deposited by him; these contested checks totaled $482,745.15.

8

(3) "reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).

Defendant pled guilty to conspiring with Bohannon and others to deposit stolen checks into fraudulent bank accounts and withdraw funds from those accounts for personal use.  The Government presented reliable and specific evidence showing that each stolen check was within the scope of jointly taken criminal activity, each check was stolen and deposited in furtherance of the scheme, and this conduct was "reasonably foreseeable" to Defendant, as Defendant participated in organizing the scheme.  Indeed, the undisputed PSR facts established that each deposited check was processed through the Bank of America lockbox facility, Fannin stole the checks, and Fannin gave the stolen checks to Defendant and Bohannon.  *See Pierre*, 825 F.3d at 1197.

The evidence also suggests that Defendant was not a low-level conspirator with little knowledge regarding the larger conspiracy.  Defendant and Bohannon organized meetings in their home to inform co-conspirators that they had several checks that needed to be deposited.  Moreover, James Ray—who deposited one of the stolen corporate checks—told Postal Inspector Sims that Defendant approached him regarding the bank fraud scheme.  Although Defendant correctly points out that Ray did not provide an accurate physical description of Defendant, Ray did give other accurate information indicating that he had contact with Defendant,

9

including Defendant's telephone number, the make of his car, and the area where he lived.  Because the actions of Defendant's co-conspirators were within the scope of the jointly undertaken criminal activity, these acts can be attributed to Defendant, regardless of whether he personally deposited or induced a particular check to be stolen.  *See* U.S.S.G. § 1B1.3(a)(1)(B).

Defendant's argument that he should not be held accountable for the stolen corporate and personal checks, which were found during the search of his hotel rooms in 2010, is without merit.  It is of no consequence that he and Bohannon rented the rooms together, or that officers had received an anonymous tip that Bohannon was engaging in fraudulent activity at that hotel.  The fact is that these checks were found in hotel rooms that Defendant admitted he rented, along with other documents pertaining to fraud, including multiple credit cards in other people's names, stolen checks, files with personal identifying information, and bank account information.  Accordingly, the district court did not commit clear error by attributing the loss amounts associated with these checks to Defendant.

Nevertheless, even if we determined that the district court clearly erred by attributing the contested loss amounts to Defendant, any error would be harmless. *See United States v. Barner*, 572 F.3d 1239, 1247 (11th Cir. 2009) ("A Sentencing Guidelines miscalculation is harmless if the district court would have imposed the same sentence without the error.").  At sentencing, the district court stated that if it

10

had miscalculated the guideline range "under the aggravating facts and circumstances of this case[,] a total sentence of 234 months is the least sentence that [it] would impose under any set of facts or any different guideline calculations."  Because the district court indicated that it would have imposed the same sentence, even if it erred in calculating the guideline range, any error in attributing the entire loss amount to Defendant is harmless.  *See id.* at 1248 ("Where a district judge clearly states that he would impose the same sentence, even if he erred in calculating the guidelines, then any error in the calculation is harmless.").

For the foregoing reasons, Defendant's sentence is **AFFIRMED**.[4]

---

[4] We also reject Defendant's argument raised for the first time on appeal that the district court failed to apply the 2015 changes to the Sentencing Guidelines' definition of "intended loss."  The record simply does not support this assertion, as the PSR indicated that it applied the 2015 Guidelines and the district court explicitly stated that its guidelines calculations were based on the 2015 edition of the Sentencing Guidelines.