[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11622

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDERICK TURNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:20-cr-00021-KD-MU-1

_____

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Frederick Turner appeals his convictions following a bench trial for conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). On appeal, Turner challenges the district court's denial of his motion to suppress evidence—drugs and a firearm—and statements derived from a traffic stop. He argues that Officer Jason Kolbe with the Baldwin County Sheriff's Office unlawfully prolonged the traffic stop without reasonable suspicion. After careful review, we find no reversible error and therefore affirm.

## I.    BACKGROUND[1]

On December 20, 2019, Kolbe was on patrol on I-65 in Baldwin County, Alabama. His patrol car was parked in the median when he saw a tractor-trailer hauling a Chevrolet Avalanche,[2] a

---

[1] We describe the relevant facts based on the body camera footage and testimony admitted at the suppression hearings and construe them in the light most favorable to the prevailing party, here, the government. *United States v. Pierre*, 825 F.3d 1183, 1191 (11th Cir. 2016).

[2] Kolbe testified that he did not know that the pick-up truck was a Chevrolet Avalanche when the tractor-trailer first passed him.

pick-up truck, driving in the passing lane. The driver had remained in the lane for over 1.5 miles without passing any other vehicles, in violation of Alabama law. Kolbe pulled out of the median and began following the vehicle. He observed the vehicle move to the right lane and twice veer over the fog line, also in violation of Alabama law. Kolbe activated his blue lights and initiated a traffic stop.

After the tractor-trailer pulled over, Kolbe approached the driver, Turner. Turner's girlfriend, Sylvia Guerra, was seated in the passenger seat. Turner stated that he had been stopped by law enforcement 45 minutes prior in Mobile, Alabama. Kolbe asked Turner why he had been stopped, and Turner explained that the officer had asked about the pick-up truck on his tractor-trailer. About his travel plans, Turner stated that he was moving from Laredo, Texas to South Carolina.

Kolbe asked about the ownership of the Chevrolet Avalanche and the tractor-trailer. Turner explained that he owned the Chevrolet but the transmission was not working, so he placed it on the tractor-trailer, which he was leasing. Turner handed Kolbe his driver's license, and Kolbe explained that he had stopped Turner because of the left-lane violation. Kolbe stated that he was not going to write Turner a ticket for the left-lane violation.

Kolbe asked Turner whether he drove the Chevrolet Avalanche often. Turner explained that he typically used the pick-up truck to go between Texas and South Carolina for his company and that he also ran a body shop in Texas. Kolbe asked whether he had ever built traps, or hidden compartments in vehicles, and Turner

responded that he had not. Kolbe again asked why Turner had been stopped in Mobile, Alabama and Turner stated that it was for a courtesy check. Turner explained that he received no paperwork from the previous stop. Kolbe asked Turner to accompany him to his patrol car to check Turner's driver's license because he was unaware of what the previous officer had checked.

On the way to the patrol car, Kolbe asked who owned the tractor-trailer.[3] Turner explained that a company named Racine Auto Sales previously owned the tractor-trailer, but a company named JLG Carriers bought it. However, a third company, named F&A Haulers, was depicted on the side of the truck. Turner explained that he had a leasing agreement with JLG Carriers. Kolbe asked Turner to retrieve the registration for the Chevrolet Avalanche and mentioned to the backup officer that Turner appeared to be very nervous.

Once Kolbe and Turner were seated in the patrol car, Kolbe asked Turner questions about Turner's commercial driver's license, whether he was on probation, whether he had been in trouble, how long he had owned the Chevrolet Avalanche, and where he had purchased it. Twelve minutes into the stop, Kolbe returned the documents to Turner and asked if he understood why he had been stopped. Turner asked if he could have documentation verifying that Kolbe had stopped him.

---

[3] At this point during the traffic stop, a backup officer had arrived.

While Kolbe was typing a warning to issue to Turner, he asked Turner whether: (1) he was responsible for everything in the Chevrolet Avalanche; (2) he had personal items in the Chevrolet Avalanche; (3) there was anything illegal in the Chevrolet Avalanche. Turner explained that he was responsible for the Chevrolet Avalanche but had no personal items or anything illegal in it. Kolbe explained that he previously had seized Chevrolet Avalanches with hidden compartments in them. Kolbe asked whether there were any hidden compartments in the tractor-trailer, and Turner said no. Kolbe then inquired why Turner was so nervous. Turner expressed that he was aggravated that he had been pulled over with the Chevrolet Avalanche, as he had been multiple times before. Kolbe tried to print the warning, but his printer malfunctioned.

Around 18 minutes into the traffic stop, Kolbe asked for consent to search the tractor-trailer and Chevrolet Avalanche, but Turner did not consent. Kolbe then deployed his canine partner to conduct a canine sniff. The canine alerted on the passenger side door and gas tank area of the tractor-trailer. The officers searched the vehicle and ultimately discovered 31.9 kilograms of cocaine and a pistol. After being advised of and waiving his *Miranda*[4] rights, Turner admitted that he owned and possessed the firearm recovered from the tractor-trailer and that he had been paid to transport the cocaine.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Turner moved to suppress[5] the evidence and statements derived from the traffic stop, arguing that Kolbe prolonged the stop in violation of his Fourth Amendment rights. The district court held two evidentiary hearings, at which Kolbe testified to the following. He had been a law enforcement officer since 2004. He had been a part of the Special Operations Unit, which focused on enforcing traffic laws, for 10 years when he pulled Turner over in December 2019. As a part of this unit, Kolbe had received several hundred hours of training in courses such as detecting human behavior and patterns of criminal interdiction, including drug trafficking trends, detecting hidden compartments, and smuggling methods.

---

[5] This motion was Turner's second motion to suppress. He filed a first motion to suppress in which he argued that Kolbe lacked probable cause to stop his vehicle. The district court held a suppression hearing and denied the motion, reasoning that Kolbe was credible and had probable cause to pull Turner over. Because Turner raises no challenge to whether Kolbe had probable cause to initiate the traffic stop on appeal, that issue is abandoned. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

After the district court denied Turner's first motion to suppress, Turner obtained new counsel and filed a motion for leave to file a second motion to suppress or, alternatively, a motion to reconsider the denial of his first motion to suppress. The district court granted the motion and held a second suppression hearing but limited the hearing in scope to issues not covered in the first hearing. Although Turner designates the denial of his first motion to suppress in his notice of appeal, his initial brief challenges the district court's denial of his second motion to suppress. Accordingly, we recite the relevant facts from both suppression hearings to provide context, focusing on the district court's denial of Turner's second motion to suppress.

About the traffic stop, Kolbe explained that when he initiated the stop, Turner appeared nervous and immediately stated that he already had been stopped by law enforcement. Kolbe explained that, throughout his interaction with Turner, Turner's chest was heavily rising and falling, he was speaking quickly, he was overly talkative, and he did not make sense. Kolbe testified that Guerra also drew his suspicions because she was frozen and staring out of the front window as if Kolbe was not there. Kolbe explained that Guerra did not want to make eye contact and that it was several minutes before she said anything.

Kolbe testified that he asked the couple about their travel plans and noticed short hesitations and stuttering in Turner's responses. Kolbe testified that he "felt like it was almost a fictitious story that [Turner] was, on the fly, trying to make up something." Doc. 219 at 9.[6] Although Turner said that he was moving from Texas to South Carolina, Kolbe stated that he saw no indication that Turner was moving in either the windows of the pick-up truck or the cab of the tractor-trailer.

Kolbe further testified that the way in which Turner was hauling his vehicle was suspicious. Kolbe explained that there usually were two types of vehicle-hauling trucks that traveled from Texas. First, there were empty trucks that went to the northeast part of the United States and picked up a load of auctioned vehicles to bring back. Second, there were door-to-door haulers, which also

---

[6] "Doc." numbers refer to the district court's docket entries.

typically carried a load of vehicles. Kolbe testified that he was suspicious of Turner because he only had one vehicle, so it was unlikely that he was an auction or door-to-door vehicle hauler because hauling one vehicle was not profitable. Further, Turner eventually explained that the Chevrolet Avalanche was his personal vehicle, which was not economical to haul on the tractor-trailer from a fuel consumption perspective.

Kolbe testified that he had personal experience in the owner-operated trucking industry because his parents ran a trucking business for which he had worked. As for car haulers, Kolbe explained that he obtained knowledge through his 10 years working in the Special Operations Unit and speaking or spending time with legitimate truck drivers.

Kolbe testified that Turner's response about who owned the tractor-trailer further raised his suspicions. Kolbe explained that it was uncommon for companies to change names very often and that criminal organizations tended to rename their companies and retag their trucks to avoid suspicion.

The district court denied Turner's second motion to suppress. The court first found that it took Kolbe around 12 minutes to address the traffic violations. The court explained that, during that time, Kolbe addressed the reasons for the traffic stop and made ordinary inquiries incident to the stop. Next, the court found that Turner's actions extended the stop by six minutes because Turner requested written documentation that he had been stopped, and Kolbe tried to complete Turner's request. The court found that

Kolbe developed a reasonable suspicion to prolong the stop until the canine sniff based on multiple factors, including Turner's nervous behavior, Guerra's failure to make eye contact, Turner's implausible explanations about his travel, and the unusual use of his tractor-trailer.

Turner waived his right to a jury trial and proceeded to a stipulated bench trial. He preserved his right to appeal the denial of the motion to suppress. The district court found Turner guilty of all three counts. The court explained that it did not consider the suppression hearing testimony but relied solely on the evidence to which Turner stipulated. The district court sentenced Turner to 180 months' imprisonment and 5 years' supervised release.

This is Turner's appeal.

## II.    LEGAL STANDARD

We review the district court's denial of "a motion to suppress evidence under a mixed standard, reviewing the court's findings of fact for clear error and the application of law to those facts *de novo*, construing the facts in the light most favorable to the prevailing party below." *United States v. Pierre*, 825 F.3d 1183, 1191 (11th Cir. 2016). We review *de novo* a district court's determination whether there was reasonable suspicion and probable cause. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## III.    DISCUSSION

Turner contends that Kolbe prolonged unlawfully the duration of the traffic stop by making non-traffic-related inquiries about

the Chevrolet Avalanche. He asserts that the inoperable Chevrolet on his tractor-trailer was not connected to traffic safety, his authorization to drive, or the validity of his driver's license.[7] We disagree.

Consistent with the Fourth Amendment, a police officer may conduct a brief investigative traffic stop when the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (internal quotation marks omitted). "Even minor traffic violations qualify as criminal activity." *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (en banc). Reasonable suspicion is determined based on the totality of the circumstances, including "both the content of information possessed by police and its degree of reliability." *Navarette*, 572 U.S. at 397 (internal quotation marks omitted). In deciding whether reasonable suspicion existed at the pertinent time, we consider whether reasonable suspicion existed objectively under the circumstances. *See United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006). An officer's subjective motivations are immaterial to whether a traffic

---

[7] Although Turner's second motion to suppress was styled as a motion for leave to file an out-of-time second motion to suppress or, alternatively, a motion for reconsideration of the denial of the first motion to suppress, neither party cites reconsideration law in their briefs on appeal. Further, the district court limited the second suppression hearing to issues not covered in the first hearing. Accordingly, we review the second motion to suppress under the traditional standard of review for such motions, *see Pierre*, 825 F.3d at 1191, which is less stringent than the standard for reviewing the denial of a motion for reconsideration.

stop is reasonable under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996).

Police may rely "on their own experience and specialized training to make inferences from and deductions about" the information before them, and we "give due weight to the officer's experience" when examining the totality of the circumstances. *See United States v. Lindsey*, 482 F.3d 1285, 1290–91 (11th Cir. 2007) (internal quotation marks omitted); *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991).

Even when reasonable suspicion exists to make a traffic stop, police "do not have unfettered authority to detain a person indefinitely." *Campbell*, 26 F.4th at 881. A traffic stop "is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *Id.* at 884. The purpose of the traffic stop includes addressing the traffic violation that prompted the stop and attending to "related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). An officer's mission during a traffic stop includes "ordinary inquiries incident to the traffic stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (alteration omitted).

Here, considering the totality of the circumstances, we cannot conclude that Kolbe unlawfully prolonged the traffic stop. Kolbe's questions about Turner's travel plans constituted

"ordinary inquiries" related to the traffic stop. *See Campbell*, 26 F.4th at 885 ("Generally speaking, questions about travel plans are ordinary inquiries incident to a traffic stop.").

As Kolbe performed routine traffic-related tasks, he observed conduct giving rise to reasonable suspicion beyond the traffic infraction. Turner and Guerra both exhibited nervousness, even after being told that Kolbe was not going to write a ticket for the left-lane violation. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *United States v. Simms*, 385 F.3d 1347, 1350, 1354-55 (11th Cir. 2004) (concluding that reasonable suspicion existed to prolong a traffic stop in part because the driver "continued to appear very nervous even after being told he was only getting a warning citation"). And, despite Turner's assertion that he was moving from Texas to South Carolina, Kolbe observed no indication that Turner was moving in either the Chevrolet Avalanche or the tractor-trailer. Based on this and Kolbe's experience in the Special Operations Unit, as well as in the trucking industry, he believed that the use of the tractor-trailer was unusual. *See Lindsey*, 482 F.3d at 1290-91; *Briggman*, 931 F.2d at 709.

The totality of these circumstances gave rise to reasonable suspicion that Turner was involved in criminal activity beyond the initial traffic violation. Because reasonable suspicion existed when Kolbe asked additional questions about the Chevrolet Avalanche (questions aimed at investigating criminal activity beyond the

traffic infractions), those questions did not unlawfully prolong the traffic stop.[8]

## IV.    CONCLUSION

The district court properly denied Turner's motion to suppress. We affirm Turner's convictions.

**AFFIRMED.**

---

[8] Although the district court came to the same conclusion for a different reason, "[w]e may affirm for any reason supported by the record." *United States v. Thomas*, 32 F.4th 1073, 1077 (11th Cir. 2022).