[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12474

_____

D.C. Docket No. 1:16-cr-20927-FAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

REGINALD WAYNE GIBBS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 6, 2019)

Before MARCUS and DUBINA, Circuit Judges, and GOLDBERG,[*] Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

Reginald Gibbs appeals the district court's denial of his motion to suppress evidence -- a firearm recovered from his person by police -- after conditionally pleading guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Since Gibbs's encounter with the police was part of a lawful traffic stop, and the seizure of the firearm from his pocket was likewise lawful, we affirm the judgment of the district court.

**I.**

The essential facts are these. Around 5:40 p.m. on the evening of November 30, 2016, Detective Erick Lopez of the Miami-Dade Police Department was on patrol in the area of 62nd Street and Northwest 17th Avenue in Miami, Florida. According to Lopez, this was a "high crime area" "known to have a high inciden[ce] of shootings." Detective Lopez has been a member of the Crime Suppression Team and was assigned to that team for some six years. Lopez recounted that he had investigated two shootings in the area. Along with Detective Jonathan Dweck, Lopez also had investigated an incident in which a person pulled a handgun on several other individuals but ultimately did not shoot anyone.

Detective Lopez was traveling eastbound in his unmarked police car on 62nd Street -- a two-lane street with one lane going east and one going west. Lopez saw a black Audi sedan that was traveling westbound pull into the oncoming traffic of the eastbound lane and come to a stop. The black Audi was thus parked head-on to

2

the oncoming traffic and obstructed the flow of traffic in the eastbound lane. After stopping in the middle of the street, the driver of the Audi exited the vehicle.

Lopez, who was in the eastbound lane, passed the Audi, continued eastbound to the end of the block, made a U-turn, and parked his car behind the Audi. Before turning around, Lopez radioed to see if other officers were in the neighborhood to assist him in stopping the driver of the Audi and issuing a citation for obstructing the flow of traffic. Lopez called for backup because, he said, he was concerned that there might be an altercation when he cited the driver, offering that traffic stops sometimes escalate when people become upset. Detective Jonathan Dweck responded that he was "just a couple of seconds away" and agreed to assist. Dweck, also in an unmarked police car, pulled up and parked in front of the Audi. Both officers were in plain clothes, both wore tactical vests with the word "police" on the front, and both officers activated the lights on their unmarked cars as they pulled up.

It is undisputed that, when the detectives exited their vehicles, the black Audi's engine was still running, its headlights were on, and it was blocking traffic. No one was in the Audi. JD Jones, the driver of the Audi, was standing just outside, between the Audi and another car parked on a gravel shoulder area next to the road. The space between the two cars was just wide enough for two people to stand there. The appellant, Reginald Wayne Gibbs, was standing next to the

3

driver, Jones, and both men stood right next to the black Audi. Gibbs was never a passenger in the Audi, but approached Jones just after he stopped his vehicle and joined Jones in the space between the two cars. When Officers Lopez and Dweck approached, Jones and Gibbs were "basically channeled between the[] two cars." Lopez approached from the back of the Audi and Dweck approached from the front. Thus, Jones and Gibbs would not have been able to leave without going through Lopez or Dweck or vaulting over one of the vehicles. Lopez agreed that they effectively blocked Gibbs from leaving.

Detective Lopez, who had observed the Audi's traffic violation, was aware that Jones was the driver of the Audi, and thus focused his attention on Jones. Dweck did not know which of the two men -- Gibbs or Jones -- had been the driver of the Audi. He testified that neither of them was free to leave until he determined who was the owner or driver of the Audi and issued a traffic citation. Both detectives testified that they were not investigating Gibbs for anything else when they arrived at the scene.

Dweck approached Gibbs first because Gibbs stood closest to him. As he approached, Gibbs put his hands up over his head. Dweck testified that, when he first pulled up in his vehicle, he noticed Gibbs looking around to the left and right and explained that, in his experience, the way Gibbs was looking around suggested that he might be preparing to flee. Before he was asked anything by the detectives,

4

and almost immediately upon seeing Dweck, Gibbs said this: "Officer, I'm going to be honest. I have a gun on me." The district court found that the entire encounter from the moment Lopez and Dweck exited their vehicles, to the time Gibbs made his statement, took just a matter of seconds.

After Gibbs said he had a gun, Dweck asked Gibbs whether he had a permit for the firearm; Gibbs responded "No, I don't." Gibbs informed Dweck that the gun was in his back pocket. Dweck alerted Lopez to the presence of the firearm, handcuffed Gibbs and directed Lopez to get a camera and gloves. Lopez retrieved those items and photographed the loaded .22 caliber Jimenez Arms pistol in Gibbs's back pocket. The officers arrested Gibbs for carrying a concealed weapon without a permit.

Witnesses Javari Irving and Markedia Johnson, both relatives of Gibbs, testified at the suppression hearing that the officers exited their vehicles with their weapons drawn. Irving and Johnson were standing a short distance away from the Audi, outside a nearby apartment complex where they both lived. Irving was standing between the apartment's dumpster and a wooded area, talking to a friend, and Johnson was located just outside her front door watching her children play. Irving said that he saw an officer approaching Gibbs with his gun drawn. Johnson added that she saw two officers approach Gibbs with their weapons drawn and yell "get down." Lopez and Dweck denied drawing their weapons when they exited

5

their vehicles, or, indeed, at any time during the entire encounter.  Both detectives testified that they did not fear for their safety during the encounter.  Dweck also testified that he did not give Jones and Gibbs any commands as he approached.

## II.

A federal grand jury in the Southern District of Florida charged Gibbs in a single count with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  Gibbs pled not guilty and moved to suppress the firearm and the statements he had made to the police during the encounter -- specifically, that he had a gun but he did not have a concealed carry permit.  Gibbs argued that the police did not have reasonable suspicion to detain him, that his statements were not spontaneous admissions, and that the police violated his Miranda rights.

The district court conducted a suppression hearing, at which Lopez, Dweck, Irving, and Johnson all testified.  Following the hearing, the trial court issued an order denying in part and granting in part Gibbs's motion to suppress.  The district court credited (1) Irving and Johnson's testimony that the officers approached with their weapons drawn and issued commands, but also credited (2) Detective Dweck's testimony that Gibbs had raised his hands and spontaneously exclaimed that he possessed a gun.  The district court added that under the circumstances of this case -- namely the evening hour and the number of people present in a high

crime area -- the officers did not violate the Constitution by drawing their weapons for their own safety.  The district court made a factual finding that the officers had legitimate concerns for their own safety, given the "evening hour, [and] the number of people in a high crime area."  The district court explained that once the firearm was seized, Gibbs was in custody, but prior to that his detention was brief and wholly consistent with Terry v. Ohio, 391 U.S. 1 (1968) and the Fourth Amendment.[1]  The motion to suppress the loaded .22 caliber firearm and Gibbs's statements that he had a gun in his back pocket was denied, but Gibbs's statement that he did not have a permit was suppressed.

Thereafter, Gibbs entered a conditional guilty plea to being a felon-in-possession, and pursuant to Federal Rule of Criminal Procedure 11(a)(2) reserved the right to appeal the denial of his motion to suppress the loaded firearm.  The plea agreement read this way:

> The plea to the Indictment is a conditional plea, which would allow the defendant to appeal the following issue and only the following issue from the district court's order (DE 35): whether the denial of the motion to suppress the firearm was proper.  It is further agreed, that the conditional plea does not grant the defendant the right to appeal the denial of the motion to suppress the defendant's statements.

---

[1]On appeal, Gibbs also argues that the district court applied the wrong legal standard in evaluating his Fourth Amendment claim, pointing to the district court's citation of United States v. Luna-Encinas, a Fifth Amendment Miranda warnings case. 603 F.3d 876, 881 (11th Cir. 2010).  But Gibbs's suppression motion raised both Fourth and Fifth Amendment challenges to his seizure and the admissibility of his statements to Dweck about the gun. The district court's citation to Luna-Encinas is fairly read as referring to Gibbs's Fifth Amendment claim.  In any event, we may affirm on any ground supported by the record.  See Beeman v. United States, 871 F.3d 1215, 1221 (11th Cir. 2017).

The district court sentenced Gibbs to a 46-month term of imprisonment, to be followed by a three-year term of supervised release.

### III.

We review the denial of a motion to suppress as a mixed question of law and fact. United States v. Valerio, 718 F.3d 1321, 1323 n.3 (11th Cir. 2013). The trial court's factual findings are reviewed through the prism of clear error and its application of the law to those facts de novo. Id. In doing so, we construe the facts in the light most favorable to the prevailing party and afford substantial deference to the factfinder's credibility determinations. United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012).

Under the Fourth Amendment, a police officer generally may lawfully detain an individual without a warrant if (1) there is probable cause to believe that a traffic violation has occurred (a traffic stop), or (2) there is reasonable suspicion to believe the individual has engaged or is about to engage in criminal activity (an investigative or Terry stop). See United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). While there are obvious differences between a traffic stop and a Terry stop, the Supreme Court has recognized that the two are "analogous" both in their "duration and atmosphere." E.g. Berkemer v. McCarty, 468 U.S. 420, 439 n.29, 104 S. Ct. 3138, 3150 n.29 (1984). Of course, a "traffic stop supported by

probable cause" may "exceed the bounds set by the Fourth Amendment on the scope of a Terry stop."  See id.

In evaluating both traffic and Terry stops, we examine (1) whether the officer's action was justified at its inception -- that is, whether the officer had probable cause or reasonable suspicion to initiate the stop, and (2) whether the stop was reasonably related in scope to the circumstances that justified it in the first place.  United States v. Acosta, 363 F.3d 1141, 1144–45 (11th Cir. 2004); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).  "In a traffic-stop setting, the first [of these] condition[s] -- a lawful investigatory stop -- is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation."  Arizona v. Johnson, 555 U.S. 323, 327, 129 S. Ct. 781, 784 (2009).  Therefore, "police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity."  Id.

The Supreme Court has held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  Maryland v. Wilson, 519 U.S. 408, 415, 117 S. Ct. 882, 886 (1997).  The Court explained in Wilson that "traffic stops may be dangerous encounters" due to the risk that "evidence of a more serious crime might be uncovered during the stop," prompting the occupants of the vehicle "to employ violence to prevent apprehension of such a crime."  Id. at 413–14, 117 S. Ct. at 885–86.  Indeed, this risk may be "every bit as

9

great" from a passenger as from a driver and, thus, ordering a passenger to exit the vehicle reduces this risk by denying him "access to any possible weapon that might be concealed in the interior of the passenger compartment." Id. at 414, 117 S. Ct. at 886; see also Johnson, 555 U.S. at 330, 129 S. Ct. at 786 ("[T]he Court has recognized that traffic stops are especially fraught with danger to police officers. The risk of harm to both the police and the occupants of a stopped vehicle is minimized, we have stressed, if the officers routinely exercise unquestioned command of the situation." (citations, brackets, and internal quotations omitted)).

Following Wilson, this Court has consistently held that "[d]uring a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety . . . including requiring the driver and passengers to exit the vehicle 'as a matter of course.'" United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (emphasis added) (citation omitted) (quoting Wilson, 519 U.S. at 410, 117 S. Ct. at 884); see also, e.g., Terrell v. Smith, 668 F.3d 1244, 1252 (11th Cir. 2012). We have further held that, "in some circumstances, a police officer conducting a traffic stop may properly direct passengers . . . to walk a reasonable distance away from the officer." Hudson v. Hall, 231 F.3d 1289, 1297 (11th Cir. 2000). Moreover, in contexts other than traffic stops, we have cited Wilson for the more general proposition that an officer conducting a lawful stop or search may, in an appropriate setting, properly control the movements of persons at the scene in

order to ensure officer safety.  See United States v. Holloway, 290 F.3d 1331, 1340 (11th Cir. 2002) (citing Wilson in support of the principle that officers may temporarily secure persons present on a premises being searched in the interest of officer safety); see also Lewis, 674 F.3d at 1306–09 (holding that, in the interest of their safety, officers lawfully may detain an associate or companion of a person being investigated for criminal activities, without particularized suspicion of any wrongdoing as to that associate); United States v. Clark, 337 F.3d 1282, 1283, 1288 (11th Cir. 2003) (same).

As a preliminary matter, we have little difficulty in concluding that both Jones and Gibbs were detained, albeit briefly, within the meaning of the Fourth Amendment from the moment Detectives Lopez and Dweck exited their police vehicles and approached the black Audi to the time, only seconds later, when Gibbs blurted out that he had a weapon.  The detectives parked in front of and behind the Audi while Jones and Gibbs were standing between the Audi and the other parked car.  The detectives effectively boxed them in and blocked them from leaving as the detectives made their approach.  Thus, regardless of whether the detectives had their weapons drawn, Jones and Gibbs were detained from the outset of the stop for the few seconds before Gibbs said that he had a gun.  See United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) ("[A] person is seized when a reasonable person would [not] feel free to terminate the encounter

11

with the police." (internal quotations omitted)).  We must answer then two essential questions: whether the detectives had a lawful basis to detain Jones and Gibbs; and, whether the detectives, by drawing their weapons, somehow converted what was a brief and lawful stop into an unlawful detention or arrest.  See Acosta, 363 F.3d at 1144–45.

Although the district court analyzed this case as a Terry stop, we think it more accurate to describe the encounter as having arisen out of a lawful traffic stop. This case presents some differences from the typical traffic stop.  Generally, the traffic stop involves an encounter that arises when a law enforcement officer stops a vehicle travelling on the roadways, pulls the car over, and may direct the driver and any passenger to exit the car.  See, e.g., Johnson, 555 U.S. at 330, 129 S. Ct. at 784; Wilson, 519 U.S. at 410, 117 S. Ct. at 884; Whren v. United States, 517 U.S. 806, 808–09, 116 S. Ct. 1769, 1772 (1996); see also, e.g., Spoerke, 568 F.3d at 1241; Harris, 526 F.3d at 1337; Hudson, 231 F.3d at 1292.  But, in this case Jones, the driver of the Audi, exited the vehicle briefly, just before the stop occurred, and Gibbs quickly joined him at the side of the car.  Undisputedly, however, the officers pulled up to the black Audi, which was wrongfully stopped in the middle of the traffic lane, and initiated the encounter precisely in order to cite the vehicle for a traffic violation.  The traffic violation occurred in front of Detective Lopez, who was himself blocked from proceeding down the street by the

12

Audi.  Lopez immediately took steps to issue the citation upon seeing the violation.

Moreover, the traffic violation was ongoing at the time of the stop because the

Audi was still parked in the middle of the roadway. Finally,  Jones and Gibbs were

standing in arms reach of the Audi, the vehicle's engine continued to run, and its

headlights were still on.  This encounter had the essential trappings of a traffic

stop.

We also have little difficulty in finding that the traffic stop was justified.

Plainly, Detectives Lopez and Dweck had probable cause to believe that Jones, the

driver of the black Audi, had committed a traffic violation.  Lopez saw Jones drive

into the oncoming traffic lane and illegally stop his car in the middle of the street,

thereby obstructing the flow of traffic in that single lane.  Unquestionably, this was

a vehicular violation under Florida law, Fla. Stat. § 316.081(1),[2] one that posed a

palpable safety risk facing head-on into the oncoming traffic.  Detectives Lopez

and Dweck were entitled to detain Jones for the purpose of issuing him a citation

for his traffic violation.  Harris, 526 F.3d at 1337.

---

[2] The relevant part of the statute mandates that "[u]pon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway."  There are exceptions which are not applicable here. See Fla. Stat. § 316.081(1). Jones's conduct violated other traffic statutes, including Fla. Stat. § 316.1945(1)(a)(1), which prohibits "stop[ping], stand[ing], or park[ing] a vehicle . . . [o]n the roadway side of any vehicle stopped or parked at the edge or curb of a street," which Jones violated by double-parking next to another vehicle already parked on the side of the street.  Fla. Stat. § 316. 195(1) was also violated. ("Except as otherwise provided in this section, every vehicle stopped or parked upon a two-way roadway shall be so stopped or parked with the right-hand wheels parallel to and within 12 inches of the right-hand curb or edge of the roadway.").

Moreover, under the peculiar facts of this case, the detectives were also justified in briefly detaining Gibbs while conducting the traffic stop and citing Jones. Gibbs had obviously located himself in such a way that detaining Jones would naturally cause Gibbs to be detained as well -- both individuals were standing in the same narrow channel between the Audi and the car parked on the side of the road. In fact, the only way for the detectives to approach the two men was to effectively block any exit from either side of the narrow space between the two cars. And the detention itself lasted only seconds before Gibbs spontaneously said "Officer, I'm going to be honest. I have a gun on me." Finally, it's worth observing that Dweck did not know at the time of the seizure whether Jones or Gibbs was the actual driver of the vehicle and needed to determine who should be cited for the violation. Under these circumstances, it was not unreasonable for Detectives Lopez and Dweck to briefly detain Gibbs in order to maintain control of the situation, cite the vehicle, and ensure the detectives' safety. See Johnson, 555 U.S. at 327, 330, 129 S. Ct. at 784, 786; Wilson, 519 U.S. at 415, 117 S. Ct. at 886. Again, our courts have repeatedly recognized the danger inherent in traffic stops, particularly when persons other than the driver are present, and the concomitant need to exercise "unquestioned command of the situation." See Johnson, 555 U.S. at 330, 129 S. Ct. at 786; Wilson, 519 U.S. at 413–14, 117 S. Ct. at 885–86. The law is abundantly clear that the "command of the situation" during a traffic stop

14

may include the brief detention of a passenger or others present.  See, e.g., Wilson,

519 U.S. at 415, 117 S. Ct. at 886; Hudson, 231 F.3d at 1297.

Having determined that the detectives had a lawful basis to briefly detain

both Jones and Gibbs, we turn to whether the detectives somehow converted what

was a lawful stop into an unlawful one merely by drawing their weapons.  The

antecedent basis for this traffic stop -- probable cause to believe the parked Audi

violated Fla. Stat. § 316.081 and other traffic statutes -- was in no way vitiated or

undermined because Detectives Lopez and Dweck drew their firearms.  The

appellant has cited us to no case (and we can find none) that even remotely

suggests that an officer who simply drew his weapon somehow converted a lawful

detention into an unlawful one.  To the contrary, we have repeatedly held that the

mere fact that an officer drew his weapon does not transform an otherwise lawful

stop into an unlawful detention.  See United States v. Blackman, 66 F.3d 1572,

1576 (11th Cir. 1995); see also United States v. Diaz-Lizaraza, 981 F.2d 1216,

1221 (11th Cir. 1993); United States v. Aldridge, 719 F.2d 368, 371–72 (11th Cir.

1983); United States v. Roper, 702 F.2d 984, 985–86, 988–89 (11th Cir. 1983).

Thus, the presence of drawn firearms here did nothing to denude the stop of its

lawfulness.

Indeed, during oral argument Gibbs's counsel was asked: "It wasn't the

weapons that caused the detention.  It wasn't the weapons that converted a lawful,

15

brief detention into an unlawful one, was it," to which he replied: "No your honor, but I think any time weapons are drawn this court should be careful of the idea that what is being fashioned is a new, blanket, officer-safety exception to the warrant requirement." (emphases added).  Oral Argument at 31:10, United States v. Gibbs, ___ F.3d ___ (2019) (No. 17-12474), http://www.ca11.uscourts.gov/oral-argument-recordings.  The long and short of it is that the firearm issue is a red herring here.  As we see it, the lawfulness of the encounter and the brief seizure of Jones and Gibbs turn on the validity of the stop.  The traffic stop was lawful and the district court properly denied the motion to suppress the loaded .22 caliber firearm found in Gibbs's pocket only seconds after the detectives came onto the scene.  Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**