[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-12774

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

VINCENT ELROY SIMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cr-80106-RS-1

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

PER CURIAM:

Vincent Sims appeals his convictions and 248-month total sentence for possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and possession of a firearm in furtherance of a drug trafficking offense, in violation of § 924(c)(1)(A)(i).

Mr. Sims argues first that the district court erred in denying his motion to suppress evidence obtained from the center console of his car during a traffic stop because the initial stop was not based on probable cause, it was unlawfully prolonged, and the subsequent search of his console was not based on reasonable suspicion that he was armed and dangerous. Mr. Sims also challenges his sentence. He contends that it is substantively unreasonable because the 8 months added to his requested 240-month sentence, the statutory minimum, could not be justified by the sentencing factors and were solely punitive. Finally, he argues that his prior conviction for Florida robbery is not a "violent felony" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), and thus he should not have been subject to statutory enhancement.

After review of the record and the parties' briefs, we affirm. The district court properly denied Mr. Sims motion to suppress and

imposed a substantively reasonable sentence, which was subject to the enhancement required by the ACCA.[1]

# I

Mr. Sims' Fourth Amendment claim rests on the lawfulness of a traffic stop that occurred in the early morning hours of April 29, 2019.  The details of the stop were presented to a magistrate judge during a three-day suppression hearing, which included testimony from Mr. Sims and the two deputies who initiated the initial traffic stop and conducted the subsequent protective search of the vehicle.  We recount that testimony and the evidence presented during that hearing as well as the magistrate judge's credibility determinations and conclusions.  We then explain why we affirm the denial of the motion to suppress.

# A

Deputy Chahine testified that, on the night in question, he observed a car travelling down Hypoluxo Road, with dark front window tints, that appeared to be speeding. The front window caught his attention because it was not clear and made it difficult to see the driver.  Deputy Chahine ran the license plate, which showed that the car was owned by a car rental company, and he knew from experience that rental car windows could not be tinted and that tinted windows on a rental car were "usually involved

---

[1] We assume the parties' familiarity with the record and set out only what is necessary to explain our decision.

with . . . illicit criminal activity." *See* D.E. 83 at 24–25. The car then made an abrupt turn into a RaceTrac gas station located at the intersection of Hypoluxo Road and Seacrest Boulevard.

When the car left that gas station, Deputy Chahine saw it first come to rest at a stop sign before turning right onto an access road, but then roll through a second stop sign to turn left onto Seacrest Boulevard. He followed the car down Seacrest Boulevard with the intent to stop it for the stop sign violation, but as he followed it, the car turned sharply onto Loquat Tree Drive. Deputy Chahine informed Deputy Perez, whom he had contacted after initially observing the car enter the gas station, that he was watching the car. The car then turned right from Loquat Tree Drive onto Old Spanish Trail, which wraps right back onto Seacrest Boulevard. Deputy Chahine believed the car's driving pattern to be evasive.

Deputy Chahine explained that he was familiar with the area near Loquat Tree Drive and Old Spanish Trail because he had handled numerous calls there. In the two weeks prior to stopping Mr. Sims in the neighborhood, he had responded to two separate shooting incidents, and the area had a reputation as a high crime area, known for crimes of violence and narcotics. After following Mr. Sims down Old Spanish Trail, he observed Mr. Sims roll past the stop bar (past the stop sign) to turn back onto Seacrest Boulevard and initiated a traffic stop at 1:55 a.m.[2]

---

[2] The deputies testified that Mr. Sims rolled past the "stop bar" before coming to a complete stop on the intersection of Old Spanish Trail and Seacrest

After initiating the stop, Deputy Chahine went to approach the car when he noticed that Mr. Sims ducked down, moved his arm toward the center console area appearing to open it, and the vehicle shook slightly.  He then saw Mr. Sims put his hands outside the window, making him concerned when there was nothing in them because, given the movement he had just observed, he expected to see registration or paperwork.  As he spoke to Mr. Sims, Deputy Chahine noticed that he appeared startled and acted hyper, his right hand was shaking over the center console, and he would reach around the car grabbing unrelated receipts.  When Deputy Chahine asked Mr. Sims where he was going, Mr. Sims said that he was driving to his home on Seacrest Boulevard, making Deputy Chahine more concerned that Mr. Sims had attempted to evade him since his home was in the opposite direction.

Deputy Chahine then motioned to Deputy Perez, who had responded as backup, that he was going to pull Mr. Sims out of the vehicle due to his concern that there could be a weapon in the car. He based his suspicion on the motion he had observed in the car, Mr. Sims' evasive driving patter, and a bulge he noticed in Mr. Sims' pocket.  Once Mr. Sims was out of his car, Deputy Chahine conducted a pat-down, which revealed that the bulge was Mr. Sims' wallet.  No weapons were found on Mr. Sims' person.

---

Boulevard.  The stop bar refers to "the white line on the concrete that signifies where the stop sign is at."  D.E. 84 at 83.  A vehicle must come to a complete stop prior to the stop bar. *See id.*

Following the pat-down, Deputy Chahine asked Mr. Sims to wait near the front of his police car while he verified records and made the appropriate citations. Mr. Sims asked if he could return to his car and shut the door, and after being told that he could not, Mr. Sims said the deputies did not have permission to search his car. Deputy Chahine also radioed in for a criminal history check, which revealed that Mr. Sims had previously served prison time.

Before Deputy Chahine asked Mr. Sims to step out of the car and conducted the pat-down, he requested a K9 narcotics unit to the scene. The K9 unit arrived about ten minutes after the traffic stop began and performed a sniff around the outside of the car, but did not alert the officers for the presence of drugs.

At this point, Deputy Chahine made the decision to conduct a limited search of the car based on his suspicions that there was a weapon where he had initially observed Mr. Sims reaching. He checked under the driver's seat, but did not find anything. He then opened the center console of the car and observed a gun, a bag full of hypodermic needles, and medication bottles. He then placed Mr. Sims under arrest, and a later search of the center console revealed that it also contained narcotics. The firearm was loaded.

Deputy Chahine finally testified that a light meter reading of the front windows showed that 19 percent of the total light was being transmitted, which was below the legally permitted minimum of 28 percent, and the back window reading showed 13 percent, which was below the legally permitted minimum of 15 percent. *See* D.E. 78-23 (front window tint meter reading); D.E. 78-24

(back window tint meter reading). Deputy Chahine issued a citation for the stop sign violation after the vehicle left the RaceTrac gas station (the second stop sign) and for the window tint infractions. *See* D.E. 78-25 (stop sign violation citation); D.E. 78-26 (tint violation citation). On cross-examination, Deputy Chahine testified that his fear that a weapon could be in the car was not dispelled after the narcotics canine failed to alert because the canine would not alert as to the presence of weapons.

Deputy Perez corroborated much of Deputy Chahine's testimony, including the fact that the traffic stop occurred in a high crime area, and that Mr. Sims had rolled past the stop bar at the stop sign (the third stop) at the intersection of Old Spanish Trail and Seacrest Boulevard. Deputy Perez further testified that he angled his headlights toward the back of Mr. Sims' car, and Deputy Chahine angled his headlights toward the left side of the car to provide better visibility. When approaching the passenger side of the vehicle, Deputy Perez noticed the vehicle moving and the person inside the car moving. He also noticed that Mr. Sims appeared nervous and that his hand was shaking. He found it unusual that, after Deputy Chahine completed the pat-down, Mr. Sims requested to return to his car.

Mr. Sims also testified during the evidentiary hearing. He said that on the night in question, he was headed down Hypoluxo Road when he noticed two police cars. He noticed one make a U-turn (Deputy Perez), but did not believe that he would be pulled over, so he went to the gas station for drinks. He was aware of one

police car across the street (Deputy Chahine), and another police car in the RaceTrac parking lot (Deputy Perez), so when he left the gas station parking lot, his awareness was heightened, and he made sure to stop at both stop signs before getting onto Seacrest Boulevard. Mr. Sims then headed home, taking a back street through his neighborhood down Loquat Tree Drive, which is the same route that he takes every night to get home. Before pulling onto Seacrest Boulevard from Old Spanish Trail, Mr. Sims pulled past the stop bar because it was necessary to see traffic before making the turn. After being pulled over, he did not place his hands under his seat or make any sudden movement, and he immediately rolled down the window and placed his hands outside.

Mr. Sims further testified that he thought that he could return to his car after the pat-down, so he walked back toward it before he was told that he needed to wait by the police car. Deputy Perez told him that the narcotics canine did not alert, so he would hopefully be given citations and be free to go. When Deputy Chahine began to walk toward Mr. Sims' car, Mr. Sims said he did not have permission to search it. Nevertheless, Deputy Chahine conducted a limited search including of the center console. On cross-examination, Mr. Sims stated, without further explanation, that he had tinted the front windows of his rental car.

After the hearing, the magistrate judge issued a report recommending the denial of both Mr. Sims' original and amended motions to suppress. The magistrate judge rendered credibility findings in favor of both Deputy Chahine and Deputy Perez and found

Mr. Sims' testimony less credible because he previously had been convicted of felony offenses and had a direct interest in avoiding a lengthy prison term.  The magistrate judge specifically found that the dashcam footage from both deputies' cars did not impeach or contradict either deputy's testimony.

Furthermore, the magistrate judge found that the traffic stop was initially justified based on the illegal window tint of the car alone, as Mr. Sims admitted to tinting the windows, and Deputy Chahine confirmed that the windows were illegally tinted and ultimately issued a citation.  The magistrate judge also noted that he had reviewed the footage of Mr. Sims exiting the RaceTrac gas station to determine if he stopped at those two stop signs but determined that the video footage was too dark and unclear to tell either way. But the magistrate judge explained that even if Deputy Chahine was mistaken about whether Mr. Sims had come to a complete stop (at the second stop sign), that would not render the traffic stop impermissible because Deputy Chahine's mistake of fact was reasonable under the circumstances. Furthermore, the magistrate judge concluded that Mr. Sims' failure to stop before the stop bar at the intersection of Old Spanish Trail and Seacrest Boulevard (the third stop sign)—which Mr. Sims conceded—also justified the initial stop.

The magistrate judge then concluded that the deputies had reasonable suspicion, based on specific, articulable facts, that Mr. Sims was armed and dangerous, so the limited protective search of the center console of Sims' car was reasonable under the Fourth

Amendment.  Before initiating the traffic stop, Deputy Chahine believed Mr. Sims' driving to be evasive, and he observed furtive movement towards the center console of the car once it was stopped, which Deputy Perez also noticed.  Moreover, while talking to Mr. Sims in the driver's seat, Deputy Chahine observed that he was sweating, nervous, and his hand was shaking.  The magistrate judge reasoned that the police cars' overhead lights and headlights provided enough ambient light for the deputies to make their observations.

Finally, the magistrate judge noted that the traffic stop occurred in a neighborhood known as a high crime area, where Deputy Chahine had responded to two shootings in the two weeks before the traffic stop, and Deputy Chahine was aware of Mr. Sims' prior inmate status.  These facts were sufficient for the magistrate judge to find that Deputies Chahine and Perez had a reasonable belief that Mr. Sims was armed and dangerous and might regain control of a weapon upon returning to his vehicle.  Moreover, when Deputy Chahine performed his search of the car, it was limited to the center console, where he had observed the furtive movements and where a weapon could be hidden.  The magistrate judge finally found that officer safety still was a concern, even though Mr. Sims was not near the car, because he would have been permitted to return at the stop's conclusion.

Mr. Sims objected to many of Deputy Chahine's observations supporting probable cause to initiate the traffic stop, as well as his reasonable suspicion that Mr. Sims was dangerous to justify

the protective limited search of the car.  He also objected to the magistrate judge's credibility findings, and conclusion that the initial stop and the subsequent search of his car were reasonable.  The district court adopted the magistrate judge's report and denied the motion to suppress.  Mr. Sims subsequently entered into an agreement to plead guilty to the three charges in his indictment, reserving his right to appeal the district court's denial of his motion to suppress.[3]

## B

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  Accordingly, evidence obtained in violation of a person's Fourth Amendment rights generally must be suppressed.  *See United States v. Andres*, 960 F.3d 1310, 1316–17 (11th Cir. 2020).

---

[3] On appeal, Mr. Sims argues that the subsequent search of his car was not based on probable cause.  *See* Appellant's Br. at 19 ("The warrantless search of Mr. Sims' vehicle violated the Fourth Amendment because it was not supported by probable cause.").  But as the magistrate judge explained, the correct inquiry with regard to this limited protective search of Mr. Sims' car is not whether the deputies had probable cause that there was contraband in the car, but whether they had reasonable suspicion that Mr. Sims' was armed and dangerous.  *See* D.E. 75 at 21–24.  *See also Michigan v. Long*, 463 U.S. 1032, 1049–51 (1983).  Mr. Sims acknowledged the appropriate standard in his reply brief, *see* Appellant's Reply Br. at 4–5, and though he should have articulated it in his initial brief, we nevertheless consider the reasonableness of the subsequent search in the interest of justice.

The denial of a motion to suppress is a mixed question of fact and law. *See United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019). We review questions of law *de novo* and questions of fact for clear error, construing the facts in the light most favorable to the party that prevailed before the district court. *See id.* And we "afford[] substantial deference to the factfinder's credibility determinations." *Id.*

### 1

A traffic stop is an unreasonable seizure "unless it is supported by reasonable suspicion of criminal activity or probable cause that a traffic violation has occurred." *Andres,* 960 F.3d at 1317. The reasonableness of a traffic stop does not depend on the subjective intentions of the officers involved. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

The legality of a traffic stop is analyzed under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). We examine "(1) whether the officer's action was justified at its inception—that is, whether the officer had probable cause or reasonable suspicion to initiate the stop, and (2) whether the stop was reasonably related in scope to the circumstances that justified it in the first place." *Gibbs*, 917 F.3d at 1294. The first of these conditions "is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

A traffic stop is supported by probable cause when "the facts and circumstances within the collective knowledge of law enforcement officials . . . are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) (alteration in original) (quotation omitted). Under Florida law, driving with illegally tinted windows is a violation and serves as a valid basis for a traffic stop. *See id. See also* Fla. Stat. §§ 316.2953 & 316.2954.

An otherwise lawful traffic stop violates the Fourth Amendment if it is prolonged beyond the time reasonably necessary to complete the mission of the stop. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Beyond issuing a traffic ticket, the mission of a traffic stop can include checking the driver's license, searching for outstanding warrants against the driver, and checking the vehicle's registration and proof of insurance. *See id.* at 355. Although officers may conduct some unrelated investigations during the course of the stop, they may not measurably extend the duration of the traffic stop absent the reasonable suspicion ordinarily required to justify detaining an individual. *See id.* at 354–55. A dog sniff does not measurably extend the duration of a lawful traffic stop if the canine unit arrives while officers are "still conducting routine record checks and preparing the traffic citations." *United States v. Braddy*, 11 F.4th 1298, 1311–12 (11th Cir. 2021).

Here, the initial traffic stop was lawful because Mr. Sims was stopped based on probable cause that his vehicle's windows were tinted beyond the legally acceptable parameters. Deputy Chahine

noticed the dark tints on Mr. Sims' car and ran an initial check on the license plate, which revealed that it was a rental car. Based on his prior experience, he knew that rental car companies did not typically allow tinted windows on their rentals and that tinted windows often were a sign of illicit criminal activity. The "facts and circumstances" here were "sufficient to cause a person of reasonable caution to believe" that a traffic infraction had been committed. *See Pierre*, 825 F.3d at 1192. Our conclusion is supported by the fact that after Deputy Chahine executed the stop, he performed a window tint meter reading that revealed that the windows were in fact illegally tinted.[4]

After initiating the stop, Deputy Chahine performed routine checks reasonably related to the purpose of the stop, including running Mr. Sims' license, investigating whether he had any outstanding citations, and performing a test on the vehicle's tint levels. He also conducted a criminal background check and called for a narcotics K9 unit after he observed certain red flags as he approached

---

[4] We find no reason to address whether Mr. Sims did in fact stop at either the second stop sign outside the RaceTrac gas station or the third stop sign at the intersection of Old Spanish Trail and Seacrest Boulevard. Though the dashcam footage did contain audio of Deputy Chahine telling Mr. Sims that "the reason for the stop" was that Mr. Sims "didn't come to a full and complete stop before [he] got onto Seacrest [Boulevard]," D.E. 78-18 at 3, Deputy Chahine also testified that he believed the windows were illegally tinted and that was also why he initiated the stop. Because the magistrate judge (and district court through adoption) credited Deputy Chahine's testimony, and we owe those findings "substantial deference," *see Gibbs*, 917 F.3d at 1294, we do not disturb them here.

Mr. Sims' car and began talking to him, including Mr. Sims' furtive movements toward the center console and his general nervous demeanor as Deputy Chahine asked him routine questions. No more than ten minutes passed from when the stop was initiated, and the K9 unit arrived to do a sniff around the perimeter of the vehicle. Thus, this slight delay does not constitute an impermissibly prolonged stop.

In sum, we hold that the initial traffic stop was supported by probable cause based on Deputy Chahine's reasonable belief that the windows were tinted beyond the legally acceptable limit and that the stop was not prolonged in an unconstitutional manner.

**2**

Though Mr. Sims characterizes his challenge of the subsequent search of his car as "a warrantless search" that lacked probable cause, in the interest of justice we will construe his argument as one that contests whether the deputies had reasonable suspicion that he was armed and dangerous. Officers are permitted to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). The Supreme Court has explained that "protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *Long*, 463 U.S. at 1049. Limited protective sweeps,

including a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* (citing *Terry*, 392 U.S. at 21).

The magistrate judge noted the specific articulable facts that provided Deputy Chahine with the reasonable belief that Mr. Sims could have a weapon in his vehicle.  We quote that thorough analysis here:

> In light of [Mr. Sims'] evasive and suspicious driving patten, his behavior and conduct that evening, the time of night and high crime area, the recent shootings in the immediate area, and the other factors testified to by the deputies, it was entirely reasonable for Deputy Chahine to conduct the limited protective search of Defendant's vehicle.

 D.E. 75 at 24.  Deputy Chahine executed a vehicle frisk based upon specific observations and his relevant experience as a deputy who patrols that area.  Given his observations and experience, Deputy Chahine reasonably believed the Mr. Sims was armed and dangerous.

Mr. Sims disagrees and contends that the deputies lacked (what we will construe as) reasonable suspicion to search his car

because the narcotics canine did not alert for the presence of drugs. But as Deputy Chahine testified, the lack of drugs in the car does not inoculate the potential for the presence of a weapon in the vehicle. In fact, the Supreme Court in *Long* addressed the specific circumstance relevant here—a stop that does not culminate in an arrest—as a situation that leaves officers "particularly vulnerable" because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Long,* 463 U.S. at 1051–52. Here, a "full custodial arrest" had not been effectuated and so the potential danger continued even after the K9 unit had done its work, and Deputy Chahine conducted a pat-down of Mr. Sims' person. So even if Mr. Sims was not in the car, the protective sweep of the car was justified to ensure that upon his return he would not pose a danger to the deputies.

We also emphasize the Deputy Chahine's search was *limited*. Reasonable suspicion that an individual is armed and dangerous is not carte blanche to search the entire vehicle. The search must be limited to the area where Mr. Sims may reasonably be hiding a weapon. *See Terry*, 392 U.S. at 25–26 ("A search for weapons in the absence of probable cause to arrest . . . must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby[.]") (citation omitted). Deputy Chahine limited his protective search to under the driver's seat where he saw Mr. Sims' duck down and the center console of

the car where he saw Mr. Sims repeatedly touch during the course of the stop.

We agree with the district court (and the magistrate judge) that the initial stop was based on probable cause that a traffic infraction had occurred, and that subsequent limited protective search of the car's center console was based on reasonable suspicion that Mr. Sims was armed and dangerous. Accordingly, the motion to suppress was properly denied.

## II

Mr. Sims challenges his sentence on two grounds. First, he argues that his sentence was substantively unreasonable. Second, he contends that the district court erred in subjecting him to the ACCA enhancement under the guidelines. We do not find either argument persuasive, and explain why below.

## A

Mr. Sims pled guilty to the charges at a plea hearing, where he admitted that law enforcement had searched his car after a traffic stop, finding a loaded handgun and cocaine, among other evidence, and that he was a convicted felon.

The presentence investigation report (PSI) prepared for sentencing assigned a base offense level of 14 and added 2 levels because Mr. Sims had obstructed justice at the suppression hearing, resulting in an adjusted offense level of 16. *See* PSI at ¶¶ 19, 23–24. Mr. Sims was convicted of violating 18 U.S.C. § 922(g) and had three prior convictions of violent felonies under Florida law: (1)

aggravated battery with a firearm; (2) resisting an officer with violence; and (3) robbery with a firearm. *See id.* at ¶ 25. He was therefore subjected to an enhanced sentence under the ACCA, making his offense level 33 under U.S.S.G. § 4B1.4(b)(3)(B). *See id.*

Because of his armed career criminal designation, the applicable criminal history category was IV. *See id.* at ¶¶ 55–56. The statutory range of imprisonment for Count One was 15 years to life, and Count Two had a maximum sentence of 20 years. *See id.* at ¶ 103. Count Three required a mandatory consecutive sentence of at least five years. *See id.* Based on an offense level of 33 and criminal history category of IV, the advisory guidelines range of imprisonment was 188 to 235 months based on Counts One and Two. *See id.* at ¶ 104. The guidelines did not provide a range inclusive of the mandatory consecutive sentence for Count Three, but inclusion of a consecutive sentence of five years results in a total range of 248 to 295 months' imprisonment. *See id.*

Mr. Sims objected, without further explanation, that his prior Florida conviction for robbery with a firearm did not qualify as a predicate offense under the ACCA. He also objected to not receiving credit for acceptance of responsibility, arguing that he had pled guilty to the indictment, avoiding a lengthy trial. He finally objected to receiving an enhancement for obstruction of justice.

Mr. Sims then filed a sentencing memorandum, where he requested that he be sentenced to the statutory minimum 240-month term of imprisonment. He argued that: (1) without the

armed career criminal designation, his guidelines range would be significantly lower and not subject to a 15-year minimum; (2) the prior convictions that qualify him as an armed career criminal were more than 30 years old; and (3) the career offender guidelines' use of criminal history is not an accurate measure of the risk of recidivism.

During the sentencing hearing, the district court admitted certified copies of Mr. Sims' prior convictions. Mr. Sims had been convicted of robbery with a firearm, under Fla. Stat. §§ 812.13(1) and (2)(a) and 775.087(2), in 1991. After hearing argument, the district court sustained Mr. Sims' objections to receiving an obstruction enhancement and not receiving a decrease for acceptance of responsibility. The district court overruled Mr. Sims' objection that he did not qualify as an armed career criminal, finding that all three prior offenses qualified as valid ACCA predicates. The district court recalculated Mr. Sims' guidelines range to be 151 to 188 months' imprisonment. Considering, however, the mandatory minimum sentence for Count One and mandatory consecutive sentence for Count Three, the effective guidelines range was calculated to be 240 to 248 months' imprisonment. The government requested a sentence at the high-end of the range, and Mr. Sims requested the statutory minimum sentence of 240 months.

Following Mr. Sims' allocution, the district court stated that it had considered his personal history, and specifically took into account how he had grown up in a rough neighborhood. It then noted that Mr. Sims had a serious criminal history, and it was

concerned that his crimes began when he was 16, yet he continued to engage in serious violent crimes.  The district court was particularly concerned that Mr. Sims' prior prison sentence did not seem to deter his actions, stating, "to serve 15 years in prison and get out, you, would think, well, I don't want to go back anymore."  D.E. 133 at 104.  Finally, the court stated that Mr. Sims' record, history, "and the offense speaks for itself," and after consideration of the parties' arguments, the PSI, and the 18 U.S.C. § 3553(a) factors, it would impose a sentence within the guidelines range, which "would provide sufficient punishment and deterrence."  *Id.* at 105. The district court subsequently announced a sentence of 248 months in total, with 188 months for both Counts One and Two, running concurrently, and 60 months for Count Three, running consecutively.  *See id.*

## B

When reviewing the reasonableness of a sentence, we must ensure that the district court did not commit a significant procedural error.  *See Gall v. United States*, 552 U.S. 38, 51 (2007).  We review the substantive reasonableness of the sentence by considering the totality of the circumstances under a deferential abuse-of-discretion standard.  *See id.*  A district court abuses its discretion when it (1) fails to consider relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment by balancing the proper factors unreasonably.  *See United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).  Proper factors include the

circumstances of the offense, the criminal history of the defendant, the seriousness of the crime, the promotion of respect for the law, just punishment, adequate deterrence, and protection of the public. *See* 18 U.S.C. § 3553(a).

The district court does not have to give all the factors equal weight and has discretion to attach greater weight to one factor over another. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015). Along with the § 3553(a) factors, the district court should consider the particular facts of the case and the guidelines range. *See id.* at 1259–60. The party challenging a sentence has the burden of showing that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the deference afforded to the sentencing court. *See id.* at 1256.

We will not substitute our own judgement for that of the sentencing court, as the relevant question is not whether we would have come to the same decision as the sentencing court, but whether the court's decision was within the range of permissible sentences. *Id.* at 1254. Though we do not apply a presumption of reasonableness to sentences within the guidelines range, we ordinarily expect such a sentence to be reasonable. *See United States v. Stanley*, 739 F.3d 633, 656 (11th Cir. 2014). Moreover, a sentence imposed well below the statutory maximum also indicates that the sentence is reasonable. *Id.*

Here, the district court did not abuse its substantial discretion because it considered the § 3553(a) factors, taking Mr. Sims' individual history and characteristics into consideration, and

reasonably chose to place more weight on Mr. Sims' criminal history. His sentence was reasonable, moreover, because it was within the guidelines range and below the statutory maximum. Accordingly, we affirm as to this issue.

## C

We review *de novo* whether a prior conviction qualifies as a violent felony under the ACCA. *See United States v. Deshazior*, 882 F.3d 1352, 1354 (11th Cir. 2018). The categorical approach is used to determine whether a prior conviction qualifies under the ACCA's elements clause. *See United States v. Sanchez*, 940 F.3d 526, 530 (11th Cir. 2019).

A defendant convicted of being a felon in possession of a firearm under § 922(g) who has three or more prior convictions for a "violent felony" or "serious drug offense" faces a mandatory minimum sentence of 15 years under the ACCA. *See* 18 U.S.C. § 924(e)(1). The ACCA's elements clause defines a "violent felony" as any crime punishable by a term of imprisonment exceeding one year that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i).

Under Florida law, the mere snatching of property from another does not meet the requirement for robbery that the offender used physical force sufficient to overcome the victim's resistance. *See Stokeling v. United States*, 139 S. Ct. 544, 554–55 (2019) (citing *Robinson v. State*, 692 So. 2d 883, 886 (Fla. 1997)). Indeed, Florida

robbery has "*never* included a theft or taking by mere snatching because snatching is theft only and does not involve the degree of physical force needed to sustain a robbery conviction." *United States v. Fritts*, 841 F.3d 937, 942 (11th Cir. 2016). Thus, under the application of the categorical approach to the Florida robbery statute, robbery qualifies as a violent felony under the ACCA's elements clause. *See Stokeling*, 139 S. Ct. at 555 ("Because the term 'physical force' in ACCA encompasses the degree of force necessary to commit common-law robbery, and because Florida robbery requires that same degree of 'force,' Florida robbery qualifies as an ACCA-predicate offense under the elements clause."). There is no exception, moreover, for pre-1997 Florida robbery convictions obtained in Florida's Fourth District Court of Appeal. *See Welch v. United States*, 958 F.3d 1093, 1097–98 (11th Cir. 2020) ("We observed that if pre-1997 Florida robbery qualified as a violent felony under either the elements clause or the residual clause, it qualified as a violent felony, nonetheless.").

Here, we are bound by our holding in *Welch*, which establishes that Mr. Sims' prior conviction for Florida robbery qualifies as a valid ACCA predicate offense without exception. Therefore, we affirm as to this issue.

## III

We find that Mr. Sims' motion to suppress was properly denied because the initial traffic stop was based on probable cause that a traffic infraction had occurred, and the subsequent limited protective search was based on reasonable suspicion that Mr. Sims

20-12774                Opinion of the Court                25

was armed and dangerous.  We also conclude that the district court's within-guidelines sentence was substantively reasonable, and that it properly applied the ACCA enhancement.

**AFFIRMED.**